BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Marc Skapof

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br> v. <br><br> EQUITY TRADING PORTFOLIO LIMITED, EQUITY TRADING FUND, LTD, BNP PARIBAS ARBITRAGE, SNC, <br><br> Defendants. | Adv. Pro. No. 10-_____(BRL) |

## COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate

of Bernard L. Madoff individually ("Madoff"), by his undersigned counsel, for his Complaint,

states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme masterminded

by Madoff and enabled by numerous others.

2.      Defendant Equity Trading Portfolio Limited ("Equity Trading") was incorporated

on November 30, 2005 and opened a customer account with BLMIS (No. 1FR124) five days

later.  Equity Trading received a $15 million avoidable transfer from BLMIS on November 11,

2008.  Defendant BNP Paribas Arbitrage, SNC ("BNP") subsequently received a $15 million

transfer from Equity Trading on November 14, 2008.  Defendant Equity Trading Fund, Ltd.

("ETF") controlled and arranged these transfers.  BLMIS also made numerous tax payments to

appropriate tax authorities on behalf of Equity Trading during the period December 2005 to

December 2008.

3.      Within the Six-Year period prior to the Filing Date, as defined below, Equity

Trading withdrew $16,465,669 from BLMIS, $15,201,525 of which was withdrawn in the 90 day

period prior to December 11, 2008 (the "Filing Date").  This action is brought to recover the

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

avoidable transfers so that this "Customer Property," as defined in the SIPA statute,[2] can be

distributed by the Trustee in accordance with his statutory authority.

4.      The Trustee brings this adversary proceeding under the statutory authority

afforded to him pursuant to SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 542,

544, 547, 548(a), 550(a) and 551 of Title 11, United States Code (the "Bankruptcy Code"), the

New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270, *et seq.* (McKinney 2001))

("DCL"), and other applicable law, for avoidance of preferential transfers, avoidance of

fraudulent transfers, recovery of subsequent transfer, and money had and received.  This action is

brought so that the Trustee can distribute Customer Property among all victims of BLMIS.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §

1334(b) and SIPA §§ 78eee(b)(2)(A), (b)(4).  This adversary proceeding is brought in this Court

where the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding originally was brought in the United States District Court for the

Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC, et al.*, No. 08-CV-10791 (the "District Court Proceeding").

6.      This case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and

(O).

7.      Venue in this district is proper under 28 U.S.C. § 1409.

---

[2] Pursuant to SIPA § 78*lll*, "The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

## THE TRUSTEE'S POWER AND STANDING

8.      Plaintiff is the Trustee appointed, by order dated December 15, 2008, for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3).  Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code.  Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA § 78fff(b).

9.      In addition to the powers of a bankruptcy trustee, the Trustee has broad powers granted by SIPA.

10.     The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

        a.      Defendants received Customer Property;

        b.      BLMIS incurred losses as a result of the conduct set forth herein;

        c.      BLMIS customers were injured as a result of the conduct detailed herein;

        d.      SIPC cannot, by statute, advance funds to the Trustee to fully reimburse all customers for all of their losses;

        e.      the Trustee will not be able to fully satisfy all claims;

        f.      the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

        g.      as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted.  As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary

damages;

      h.     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

      i.     the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## **DEFENDANTS**

11.     Defendant Equity Trading is an international business company, organized under the laws of the British Virgin Islands, with a registered address c/o Citco Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands.

12.     Defendant ETF is an international business company, incorporated under the laws of the Cayman Islands, with a registered address c/o Mourant Ozannes Corporate Services (Cayman) Limited, 3rd Floor, Harbour Centre, P.O. Box 1348 GT, George Town, Grand Cayman, Cayman Islands. ETF was a shareholder in Equity Trading and, upon information and belief, was the beneficial owner and creator of Equity Trading.

13.     Defendant BNP is a Société en Nom Collectif formed under the laws of France, with its office located at 8 Rue de Sofia, 75018, Paris, France. BNP is a wholly owned subsidiary of BNP Paribas, S.A., the largest bank in the world. BNP was a significant investor in and shareholder of Equity Trading and the recipient of funds subsequently transferred from BLMIS. The office of BNP Paribas, S.A. in New York is a branch office of BNP Paribas, S.A. in France.

14.     This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to N.Y. C.P.L.R. §§ 301 and 302 and Bankruptcy Rule 7004.  All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

15.     This Court has jurisdiction over Equity Trading and ETF because Equity Trading and ETF entered into agreements and conducted business in New York.  At all relevant times, Equity Trading was a customer of BLMIS, which operated its principal place of business in New York.  Equity Trading utilized New York banks both when it redeemed funds distributed to it by BLMIS and when it invested additional funds with BLMIS.

16.     Equity Trading and ETF derived substantial revenue by regularly doing business in New York.  Importantly, Ian Pilgrim, a representative of Equity Trading and ETF, signed the documents opening Equity Trading's account at BLMIS, signed at least one letter addressed to BLMIS in New York redeeming Equity Trading funds invested with BLMIS, and directed that BLMIS wire transfer the money through banks located in New York.  Moreover, ETF controlled the Equity Trading account at BLMIS, including decisions over investments, withdrawals and, upon information and belief, whether to file a customer claim with the Trustee.  Upon information and belief, ETF derived substantial economic benefits from its control over Equity Trading's BLMIS account.

17.     This Court has jurisdiction over BNP because BNP transacted business in the State of New York.  Additionally, because the Equity Trading Offering Memorandum names BLMIS by name, BNP purposefully sought out BLMIS and took full advantage of the rights and privileges of doing business in the State of New York.

## THE PONZI SCHEME

18.     BLMIS was a New York limited liability company that was wholly owned by Madoff.  Founded in 1959, BLMIS operated its principal place of business at 885 Third Avenue,

New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees.  BLMIS was registered with the U.S. Securities and Exchange Commission ("SEC") as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  By that registration, BLMIS was a member of SIPC.  BLMIS had three business units: market making, proprietary trading, and investment advisory (the "IA Business").

19.    BLMIS also engaged in proprietary trading, which means that BLMIS traded on its own behalf rather than on behalf of its customers.

20.    Outwardly, BLMIS functioned as both an investment adviser to its customers and a custodian of their securities.  The precise date on which BLMIS began offering investment advisory services has not been established, but it appears that BLMIS was offering such services as far back as the 1960s.  The Trustee's investigation to date establishes that, to the extent records are available, BLMIS never acted as a true investment adviser in the interest of its customers.

21.    Madoff solicited billions of dollars from investors for his fraudulent IA Business.  Outwardly, Madoff ascribed the success he purported to achieve in his IA Business to the Split-Strike Conversion Strategy ("SSC Strategy").  Madoff represented that his strategy was to invest customer funds in a subset or "basket" of the common stocks that comprised the Standard & Poor's 100 Index ("S&P 100").  Several times a year, he would purportedly move customer funds "into the market," which move consisted of allegedly purchasing a basket of stocks and corresponding options hedges.  Then customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills") and Fidelity money market

funds until the next presumed trading opportunity arose.  At the end of most quarters, the baskets
were sold and the proceeds invested in T-bills or other money market funds.

22.    As part of the SSC Strategy, Madoff also concocted a fictitious hedging strategy
for the basket of stocks.  He purported to purchase and sell S&P 100 option contracts correlated
to the stocks in the basket, thereby limiting both the downside risk associated with possible
adverse price changes in the basket of stocks and limiting profits associated with increases in
underlying stock prices.

23.    Madoff himself admitted in his Plea Allocution that, "I never made the
investments I promised clients, who believed they were invested with me in the split strike
conversion strategy."  Instead, investor funds were principally deposited into BLMIS's account
at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703 (the "BLMIS Bank Account").

24.    Although clients of the IA Business received monthly or quarterly statements
purportedly showing the securities that were held in - or had been traded through - their
accounts, as well as the growth of and profit from those accounts over time, the trades reported
on these statements were a complete fabrication.  The security purchases and sales depicted in
the account statements virtually never occurred, and the profits reported were entirely fictitious.
At his plea hearing, Madoff admitted that he never in fact purchased any of the securities he
claimed to have purchased for customer accounts.  Indeed, based on the Trustee's investigation
to date and with the exception of isolated individual trades for certain clients other than Equity
Trading, there is no record of BLMIS having cleared any purchase or sale of securities for
customers of the IA Business at the Depository Trust & Clearing Corporation, the clearing house
for such transactions, or on any other trading platform on which BLMIS could have reasonably
traded securities.

25.    Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market ("OTC") after hours rather than through any listed exchange.  Based on the Trustee's investigation to date, there is no evidence that the BLMIS IA Business ever entered into any OTC options trades on behalf of BLMIS account holders.

26.    To bolster that lie, Madoff periodically wired hundreds of millions of dollars from the BLMIS Bank Account to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity owned by Madoff.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.  In fact, MSIL wired hundreds of millions of dollars back into the bank accounts of BLMIS's proprietary trading and market making businesses in an attempt to create a record of revenues purportedly related to trades in Europe.

27.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme, and Madoff concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was overwhelmingly used to make the distributions to - or payments on behalf of - other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including Equity Trading, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

28.    During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds.  Investors were paid consistently with the statements they had been

receiving.  Some of those investors later reinvested part or all of those withdrawn payments with

BLMIS.

29.     The payments to investors constituted an intentional misrepresentation of fact

regarding the underlying accounts and were an integral and essential part of the fraud. The

payments were necessary to validate the false account statements, and were made to avoid

detection of the fraud, to retain existing investors and to lure other investors into the Ponzi

scheme.

30.     In an effort to hinder, delay, and defraud authorities from detecting the fraud,

BLMIS did not register as an Investment Adviser until August 2006.  This delayed registration

allowed BLMIS to avoid scrutiny from the SEC that may have uncovered the true dealings of

BLMIS, exposing the billions of dollars that flowed into the company that Madoff used as his

personal piggy bank.

31.     In or about January 2008, BLMIS filed with the SEC an Amended Uniform

Application for Investment Adviser Registration.  The application represented, among other

things, that BLMIS had 23 customer accounts and assets under management of approximately

$17.1 billion.  In reality, in January 2008, BLMIS had 4,900 active customer accounts and

purported assets under management of $68 billion.

### THE SIPA LIQUIDATION

32.     On December 11, 2008, Madoff was arrested by federal agents for violations of

the criminal securities laws, including, inter alia, securities fraud, investment adviser fraud, and

mail and wire fraud.  Contemporaneously, the SEC filed the District Court Proceeding against

Madoff, which remains pending.  The SEC complaint alleges that Madoff and BLMIS engaged

in fraud through the BLMIS IA Business.

33.    On December 12, 2008, The Honorable Louis L. Stanton entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

34.    On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

35.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA (known was the "Protective Decree"), which, in pertinent part:

a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

c.    removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

d.    removed the Receiver for BLMIS.

36.    By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.  By virtue of his appointment under SIPA, the Trustee has the responsibility to recover and pay out Customer Property to BLMIS customers, assess claims, and liquidate any other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, but such assets will not be sufficient to fully reimburse BLMIS

customers for the billions of dollars they invested through BLMIS.  Consequently, the Trustee

must use his broad authority, as expressed and intended by both SIPA and the Bankruptcy Code,

to pursue recovery for BLMIS accountholders.

37.    At a Plea Hearing on March 12, 2009 in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information

filed against him by the United States Attorney's Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]."  Additionally, Madoff admitted that "[a]s I engaged in my fraud, I

knew what I was doing [was] wrong, indeed criminal."  *Id.*  Madoff was sentenced on June 29,

2009 to 150 years in prison.

38.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pleaded guilty

to participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on August

11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764(RJS), DiPascali

pleaded guilty to a 10-count criminal information.  Among other things, DiPascali admitted that

the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.  Plea Allocution of Frank

DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009)

(Docket No. 11).

39.    Based upon the Trustee's ongoing investigation, it now appears there were more

than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008,

BLMIS generated account statements for its approximately 4,900 open customer accounts.

When added together, these statements purportedly showed that BLMIS customers had

approximately $68 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth

a fraction of that amount.  Customer accounts had not accrued any real profits because almost no

investments were ever made. By the time the Ponzi scheme came to light on December 11,

2008, investors had already lost approximately $20 billion in principal.

40.    Numerous indicia of fraud concerning BLMIS gave Defendants actual and/or

constructive knowledge of BLMIS' fraud. These indicia of fraud, and Defendants' willful and

deliberate decision to continue investing with BLMIS, demonstrate a motive and opportunity to

perpetuate fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent.

Given the Defendants' actual or constructive knowledge of these indicia of fraud, the Defendants

were neither innocent nor good faith investors. Defendants knew or should have known that

BLMIS was engaged in fraudulent activity.

## EQUITY TRADING WAS ON INQUIRY NOTICE OF RED FLAGS FROM THE ACCOUNT STATEMENTS IT RECEIVED FROM BLMIS

41.    Equity Trading had access to a vast amount of information about BLMIS that was

not available to the public. The account statements and trade confirmations it received from

BLMIS showed that BLMIS was likely a fraud, but Equity Trading willfully ignored these

indicia of fraud and/or irregular trading.

### Madoff claimed to execute implausible options trades

42.    At least 43 percent of all options transactions reported on account statements

given to Equity Trading detailed options transactions that exceeded the total volume of that

particular option traded on the market that day and, hence, were suspect. For example, on March

15, 2007, with a settlement date of March 20, 2007, BLMIS purportedly bought a total of 2,978

OEX call options (with April expiration and a strike price of 640), when the total volume traded

on the Chicago Board Options Exchange ("CBOE") for all such contracts that day was 455.

Similarly, BLMIS purportedly sold a total of 2,978 OEX put options (with April expiration and a

strike price of 630), when the total volume traded on the CBOE for all such contracts that day

was 422. Again, on November 14, 2008, with a settlement date of November 19, 2008, BLMIS

purportedly sold a total of 2,258 OEX put options (with November expiration and a strike price

of 475), when the total volume traded on the CBOE for all such contracts that day was 3.

Similarly, BLMIS purportedly bought a total 2,258 OEX call options (with November expiration

and a strike price of 485), when the total volume traded on the CBOE for all such contracts that

day was 46.

43.     In these instances, Equity Trading turned a blind eye to facts that the option

trading volumes reported by BLMIS were impossible if exchange-traded.

**The options trade confirmations did not identify counterparties and contained CUSIP numbers**

44.     Madoff claimed he bought and sold OTC options contracts. Significantly, in the

OTC market the counterparty is expressly identified on the confirmation statement. Upon

information and belief, the options trade confirmations received by Equity Trading from BLMIS

never identified the counterparty. Also, Equity Trading's trade confirmations contained CUSIP

numbers, securities identification numbers that appear only on trade confirmations pertaining to

CBOE index options, and never on OTC options. Because the confirmations did not indentify

the counterparty and contained CUSIP numbers, Equity Trading willfully ignored the fact that

Madoff's purported options trades could not have been purchased on the OTC market.

**Madoff claimed to settle trades outside the industry standard period**

45.     The settlement dates reflected on Equity Trading's options trade confirmations in

most instances were contrary to the standard market convention and should have also prompted

Equity Trading to inquire further about the legitimacy of these purported transactions. The

standard market convention for settlement of options transactions is within one day of the option

trade date, which is referred to in the industry as "T+1." Equity Trading disregarded information

on the trade confirmation which, on information and belief, were received by Equity Trading, revealing that over 87 percent of the options transactions that BLMIS purportedly executed on behalf of Equity Trading were settled contrary to the standard market convention.

> **If the trading purportedly done by BLMIS had occurred, Equity Trading would have been exposed to hundreds of millions of dollars in option contracts with unidentified counterparties**

46.     Trading OTC options would have required Madoff to enter into private contracts with willing counterparties.  Madoff would have entered those contracts as an agent on behalf of BLMIS's customers, such as Equity Trading.  Had those counterparties defaulted on those contracts, Madoff's customers, including Equity Trading, would have been exposed to gigantic losses.  Thus, it should have been critical to Equity Trading that the counterparties implicit in Madoff's SSC Strategy be reliable, well-capitalized and liquid.  If a counterparty failed to perform, it was Equity Trading, and not Madoff, who was exposed.

47.     Madoff refused to identify the counterparties, claiming that he had to prevent his customers from dealing directly with the counterparties and that the names of parties were proprietary.  Equity Trading never knew the identities of these options counterparties because there were none.  Equity Trading believed that it had hundreds of millions of dollars in counterparty exposure, and yet it had no idea whom it would pursue in the event of a default.  In light of this significant risk, Equity Trading recklessly and willfully ignored the fact that Madoff did not identity the counterparties to these transactions.

> **Equity Trading's account with Madoff had a negative value on multiple occasions**

48.     On approximately six occasions covering seven days, Equity Trading's cash account with Madoff had a negative value.  Equity Trading, however, did not have a margin account with Madoff, and there was no agreement permitting a negative cash balance.  The amounts were not trivial.  For example, over a two-day period in January 2006, Equity Trading

had an average negative balance of approximately $2.8 million.  Under such circumstances,

Equity Trading should not have been allowed by Madoff to run a negative cash balance.  Even

assuming it could, Madoff never charged Equity Trading a penny in interest.  This activity put a

sophisticated investment company like Equity Trading on reasonable notice to inquire further.

Equity Trading did not inquire further.

**Madoff claimed to settle stock trades at prices outside their daily range**

49.    On at least three occasions, account statements given to Equity Trading detailed

trades that were settled at a stock price outside the daily range for that stock.  For example,

Equity Trading account statements for December 2006 report a sale of 13,725 shares of Merck

(MRK).  BLMIS's records reflect that these stocks were sold with a trade date of December 22,

2006 and a settlement date of December 28, 2006 for $44.61.  The price for Merck stock in fact

bought and sold on December 22, 2006 was between $42.78 and $43.42.  A sophisticated fund

such as Equity Trading should have confirmed these trades, but it did not.

**Madoff claimed to make numerous trades inconsistent with the SSC Strategy**

50.    On other occasions, significant red flags were present in the Equity Trading

account statements because Madoff made multiple trades that were contrary to what Equity

Trading knew to be the proper execution of his purported SSC Strategy.

51.    It was Equity Trading's responsibility to ensure that Madoff complied with the

SSC Strategy.  On information and belief, Equity Trading failed to perform due diligence, and, in

any event, Equity Trading failed to act and willfully ignored these anomalies.

## EVIDENCE ABOUT MADOFF WAS PUBLICLY
## AVAILABLE BEFORE AND DURING DEFENDANTS' INVESTMENTS

52.    Under the terms of the Offering Memorandum for Equity Trading, Equity Trading

had a responsibility to its shareholders to ensure the legitimacy of their investment in BLMIS.  In

addition, BNP, as the world's largest bank, has a sophisticated, global due diligence operation.

53.    Defendants were operated by sophisticated, experienced investment professionals

who, upon information and belief, accepted fees from their customers based on purported assets

under management and/or fund performance in consideration for the due diligence they were

expected to exercise in selecting and monitoring investment advisers such as Madoff.  Despite

their sophistication, Defendants were motivated by strong returns and high profits to willfully,

consciously, and recklessly ignore publicly available evidence that BLMIS was a fraudulent

operation.

54.    Defendants knew of and were presented with red flags from many sources

including, but not limited to, financial and quantifiable information; performance and trade

information; market rumors; industry articles; publicly stated investor concerns; market and

industry experts who expressed the possibility of fraud; and their own common sense.  The

totality of the information known and available to Defendants placed them on inquiry notice of

many red flags indicating fraud, and they willfully ignored these numerous red flags.

### BLMIS's structure involved conflicts of interest

55.    BLMIS was substantially a family-run business.  Madoff family members

controlled almost every key position at the firm, including, critically, that of Chief Compliance

Officer, which position was held by Madoff's brother, Peter.  Structured as it was, BLMIS was

almost entirely devoid of independent checks and balances.  BLMIS itself held positions that

would normally be occupied by three separate entities – BLMIS was the investment adviser,

executing broker and custodian of the assets.  This meant that there was not an independent custodian to ensure the proper segregation of a customer's assets.

56.     Defendants had a unique opportunity to inquire about the structure of BLMIS. Unfortunately, they ignored that the lack of an independent custodian and the failure to segregate assets were red flags.

### BLMIS's auditor

57.     BLMIS, which had tens of billions of dollars under management, had audits prepared not by one of the major audit firms, but by Friehling & Horowitz CPAs P.C. ("Friehling"), a three person firm located in a strip mall in Rockland County, New York consisting of a solo accountant, David Friehling, an administrative assistant and a semi-retired CPA living in Florida.

58.     On November 3, 2009, David Friehling pleaded guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue Service laws, and making false filings with the SEC.

59.     Upon information and belief, Defendants accepted Friehling as a bona fide auditor of BLMIS without conducting any meaningful, independent due diligence or inquiry.

60.     Upon information and belief, Defendants did nothing to independently confirm if Friehling was adequately staffed, technically equipped or professionally capable of performing large scale domestic and international auditing services at a time when Madoff was reporting in excess of $11 billion under management.

61.     The size and lack of qualifications of Friehling and the nature of the services they provided were readily and publicly accessible to Defendants.  All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program.  This program involves having experienced auditors assess a firm's audit

quality each year. Friehling, while a member of the AICPA, had not been peer reviewed since

1993 because Friehling had informed AICPA that he no longer performed audits. Defendants,

however, accepted the prospect of high returns and willfully or recklessly ignored the fact that

Friehling was not competent to perform audits of BLMIS.

### Madoff did not charge standard asset management fees

62.    BLMIS's unusual fee structure should have also been a concern to Defendants.

The standard investment advisory fee charged by a hedge fund manager ranges from 1 percent to

2 percent of assets under management plus a performance fee of 10 percent to 20 percent of any

profits earned by the investment. Fees normally run higher for investment advisers with a

history of success. Madoff appeared to be one of the most successful investment advisers in the

world (on a risk-adjusted basis), and yet he did not charge *any* management fees. Upon

information and belief, Defendants did not question that Madoff earned only trade commissions

while foregoing hundreds of millions, if not billions, of dollars in fees.

### Despite exorbitant trading volume there was never any impact on the market

63.    Madoff told customers, such as Defendants, that the SSC Strategy involved

moving all assets into the market over the span of a few days, and then selling off all of those

securities over the same span of time. Upon information and belief, prior to registering as an

Investment Adviser, investors, such as Defendants, understood Madoff to have billions under his

management. Further, when he registered as an investment adviser in August 2006, Madoff

falsely represented in BLMIS's ADV Form filed with the SEC that BLMIS had approximately

$11.7 billion of assets under management at the end of July 2006. Later filings stated that

BLMIS was managing $13.2 billion at the end of 2006, and $17.1 billion at the end of 2007.

Defendants, therefore, knew or should have known that BLMIS was purporting to move well

over $11 billion into and out of the market over the course of a few days, a few times a year.

64.     Upon information and belief, despite numerous indicia of an exorbitant trading volume, Defendants chose not to question how Madoff was able to perform such extraordinary trading volumes without any impact on the price of the securities he bought and sold, without any market footprint, and without anyone in the securities industry having knowledge or even a whisper of any such trading activity.

65.     The sale of over $11 billion of stocks over three or four days would undoubtedly decrease the price of those stocks and thereby cut into Madoff's profits from the sales of such stock; no such impact was ever seen, and, upon information and belief, Defendants chose not to question this inconsistency.

66.     When Madoff exited the market, he claimed to have placed his customers' assets into T-bills or mutual funds.  The movement of over $11 billion in and out of the market for T-bills should have affected their price.  This too never happened, and upon information and belief, this move was not independently or reasonably investigated by Defendants.

**Madoff evaded SEC filing requirements**

67.     After registering with the SEC as an investment adviser in 2006, Madoff and BLMIS were required to file a Form 13F, which is publicly available, at the end of each quarter disclosing the securities he held on behalf of his investors.  From that point forward, Madoff pretended to convert the entire portfolio to T-bills at the end of each quarter.  This conversion was inconsistent with his purported investment strategy and should have caused Defendants to investigate.  The conversion to T-bills was supposed to be done only when necessary to avoid a downturn in the market and not on a quarterly basis.  Defendants chose not to question this incongruous activity, and this failure to investigate how the possibility that Madoff exited the

equities market in order to avoid reporting the stocks he purported to buy, and thus SEC scrutiny, indicates that Defendants were neither innocent nor good faith investors.

### BLMIS mailed paper trade confirmations

68.     Despite Madoff's reputation as a pioneer of electronic record-keeping in the market making business, Madoff, as a standard practice, did not send electronic trade confirmation to clients of his IA Business.  Madoff only provided paper print-outs, which he sent via standard mail.  Instead of receiving real-time electronic access to their accounts and trade information, which was and is customary in the industry for hedge funds and fund of fund investors, BLMIS customers, including Equity Trading, had to wait several days for their paper trade confirmations to arrive by mail.  Again, upon information and belief, Defendants willfully ignored this red flag.

## DEFENDANTS WERE WILLING TO IGNORE INDICIA OF BLMIS'S FRAUD THAT OTHERS IN THE INDUSTRY WERE NOT

69.     Many sophisticated individuals, fund managers, diligence firms, consultants and banks working with information in the public domain, and with less access than Defendants, concluded many years prior to Madoff's arrest that the consistency of the returns were literally and statistically impossible to achieve and, therefore, fraud was likely.

70.     The notion that "no one" saw indicia of fraud or that entities like Defendants were not on actual and/or constructive notice of fraud, is simply wrong.  It was not that the fraud could not be discovered, it was there to be discovered.  Defendants willfully, purposefully, and/or recklessly pretended otherwise.

71.     Edward Thorp, "the grandfather of quantitative analysis," concluded over the course of a single day, as far back as 1991, that Madoff's claimed returns were nearly impossible, and he was likely a fraud.  All Thorp needed to do was check the number of listed options in the

account of one BLMIS customer against the number of the same options traded on the Chicago

Board Exchange.

72.     Later, in 2001, in response to the MAR/Hedge and Barron's articles, Thorp wrote

to a fund manager friend expressing serious concerns about Madoff and about his friend's fund

being invested in BLMIS:

> Just read the Barron's article.  All it does is reinforce my previous
> suspicions.  Do you have access to the "actual" trades done in any
> one account?  If so, can you establish that they could be real?  That
> means checking to see if they are reported on a timely basis, rather
> than substantially delayed, that they are on listed options, that
> those options could have traded at those prices and in the volumes
> reported on the exchanges where the confirms said the trades
> occurred, and ditto with the stocks.
>
> What if you scale up your representative account to 7bn$.  Could
> the volume of imputed trading in the options markets, in the
> "universe" traded, actually have been done?
>
> Hope you don't have a major position, or that you are trading on
> "profits."

73.     Thorp explained simple, independent, and reasonable due diligence queries that

Defendants could have, and should have, undertaken.

74.     As early as 2002, Cambridge Associates consistently recommended that their

clients stay away from Madoff and Madoff-related feeder funds due to lack of transparency, a

fear of front-running the market, and a general inability to understand how the strategy could

produce cash-like, bond-like consistency of returns, in an equity strategy.  In one document,

Cambridge stated that "it felt illegal and that Madoff was not transparent," while also suggesting

that "[i]t might be interesting to compile some historic hedge fund fraud/scams for them to mull

over."

75.     In 2003, a team from Société Génerale's investment bank performed due diligence on BLMIS and found that BLMIS's numbers did not add up.  Société Génerale then forbade its investment bank from doing business with BLMIS.  In contrast, Defendants, who had more visibility into the incredibility of their reported trading activity on their account statements and their outsized rates of return, continued to do lucrative business with BLMIS until Madoff was arrested.

76.     In mid-2003, Acorn Partners – a fund of funds and investment adviser for high net worth individuals – conducted due diligence of Madoff/BLMIS and found it likely that BLMIS's account statements were generated as part of a fraudulent scheme, and "that fraudulent activity was highly likely."  Shortly after Madoff was arrested, in a letter to investors, Acorn described the indicia of fraud that led it to conclude years prior that Madoff was a fraud.  Many of the reasons given were the red flags noted above.  Indeed, Acorn saw these indicia of fraud as "not merely warning lights, but a smoking gun."

77.     One of the hedge fund world's best known money managers, James Simons, and his hedge fund, Renaissance Technologies Corp., raised numerous red flags with Madoff in or around 2003.  Although Renaissance had invested a small amount with Madoff in the early 1990s, it began to increase its own diligence efforts based, on among other things, Madoff's growing assets under management.  Renaissance analyzed the purported options trading volumes and in doing so, concluded that the volume purportedly being traded, as well as the lack of identifiable counterparties, was extremely suspicious.  Renaissance calculated that if Madoff did his options trading in one day, he would have been doing 100 percent of the options trading for the entire market.

78.    Renaissance also spoke with several market makers in over-the-counter equity options, none whom claimed to see any significant volume being traded on the days when Madoff claimed to be executing his options strategy.  Even more, Renaissance determined that whoever would have been willing to trade the basket of options Madoff purportedly was trading would have done so at unfavorable prices.  Put simply, Renaissance figured out that Madoff's options trading did not make any sense.

79.    Beyond the options issues, in November 2003, a Renaissance employee also wondered aloud regarding a number of issues concerning Madoff.  Regarding Madoff feeder funds - specifically Fairfield Sentry - the employee noted, "Madoff allows an outside group [Fairfield Greenwich] to make $100 million per year in fees for doing absolutely nothing."  The employee went on, "The point is that as we don't know why he does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention.  Throw in that his brother-in-law is his auditor and he is also high up in the organization…and you have the risk of some nasty allegations, the freezing of accounts, etc., etc."  The employee proposed that "unless we can figure out a way to get comfortable with the regulatory tail risk in a hurry, we get out."  Indeed, Renaissance made a decision in November 2003 to redeem all of its BLMIS investments.

80.    Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, advised its clients in 2007 against investing with BLMIS, Madoff, or any of his feeder funds because of certain red flags.  Simon Fludgate, head of operational due diligence at Aksia, concluded that the stock holdings reported in the quarterly statements BLMIS filed with the SEC appeared too small to support the size of the assets BLMIS claimed to be managing.  In September 2007, Aksia prepared an Investment Review of Madoff feeder fund Fairfield Sentry.

In that report, Aksia concluded that the fund's description of how returns were generated was implausible. In fact, Aksia's review of Fairfield Sentry led it to conclude that either (a) Madoff's IA account was used to supply capital to Madoff's wholesale market making business, or (b) that "[t]he Feeder Funds are part of a financial game and the approximately 1.1 billion per year of gross excess returns…do not really exist."

81.     In reaching its conclusion, Aksia found, among other things, that (1) the return stream of Fairfield Sentry did not appear to be possible under the split-strike strategy; (2) Fairfield Sentry's quarterly 13F filings uncovered no equity holdings every quarter except for one, even though Aksia was told that Madoff's strategy sometimes lasts for as long as eight months; (3) the use of the U.S. mail instead of electronic means to provide position and trading execution information was suspicious; (4) based on the amount under management for feeder funds, "the required trade sizes are huge and inconsistent with the size of the S&P 100 options market"; and (5) Madoff chose "to earn a paltry 4 cents a share" when he could have funded the strategy as a proprietary trading position and earned over one billion dollars.

82.     Albourne Partners Limited ("Albourne"), an independent consultant on hedge funds and alternative investments, advised clients for a decade that they should steer clear of Madoff. In a December 15, 2008 commentary released just days after Madoff's scheme was revealed, Albourne noted that its view on Madoff "never wavered" and that although it was not clear Madoff was a fraud, "we concluded that, where a client had a holding, it should redeem." Albourne noted that it believed Madoff's returns were "too good to be true" in that Albourne could not "think of a group of funds trading easily market-to-market assets which appeared to have weathered so many different types of storm with such apparently consistent risk-adjusted returns." In addition, according to the Albourne report, Madoff's operations were "built around

obsessive secrecy" to the extent that one of Madoff's former employees had no idea how Madoff made his money.

83.     Albourne also noted that, over time, "it became clear that there were multiple Madoff feeders, and that, in total, their assets under management exceeded the publicly assumed scale of the firm."  According to Albourne, it was extremely unusual for a fund manager to significantly understate its assets under management.  The Albourne report also explained that Madoff's purported strategy involved not only equities trading, but also options. "Given the supposed size of the assets under management, it would have been difficult to execute the strategy due to the risk of market impact."

84.     Indeed, Albourne's report is consistent with other Albourne reports prior to the revelation of the fraud.  For example, earlier in 2008, Albourne specifically reviewed a Madoff feeder fund for a particular Albourne client.  The report lists only two positives of this fund, while listing many more negatives.  In addition to the issues raised above, Albourne also mentioned that Albourne has monitored many volatility arbitrage managers, so they would expect Madoff's "simple strategy" to be replicated by others.  Of course, it was not.

85.     Albourne also found "strange" the fact that BLMIS prided itself for being "at the forefront of computerized trading," yet the feeder fund's management was content with receiving paper trade confirmations by mail a few days after the purported trade dates.  Albourne also noted that the investment advisory agreement prohibited the feeder fund's management from disclosing the identity of the Investment Manager.  Further, Albourne questioned why all trades were exited at year-end to facilitate easy auditing by noting, "It cannot be but suboptimal for a manager to put the audit process ahead of the investment strategy, i.e., potentially missing a trading opportunity."

86.     Cambridge Associates, Société Génerale, Acorn Partners, Renaissance, Aksia, and Albourne all determined that something was simply not right with Madoff and either pulled their investments or refused to recommend investments to others through BLMIS.

87.     The above are some of many illustrations showing that the investment community openly suspected Madoff was a fraud.  Defendants, specifically Equity Trading, had access to even more information, but failed to conduct reasonable due diligence, and instead, chose to ignore the reasonable conclusion that Madoff was a fraud, in favor of their own financial profit.

### THE TRANSFERS

88.     According to BLMIS's records, Equity Trading opened its account (No. 1FR124) with BLMIS, set forth in Exhibit A (the "Account"), on December 5, 2005.  For the Account, a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

89.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Account was held in New York, New York, and Equity Trading sent funds to BLMIS and to the BLMIS Bank Account in New York, New York for application to the Account and for the purported conducting of trading activities.

90.     Prior to the Filing Date, BLMIS transferred at least $16,465,669 to Equity Trading in the form of withdrawals from its BLMIS account (the "Transfers"), as set forth in Exhibit B, column 11, under circumstances which should have put Equity Trading on notice that the purported account activity was inconsistent with legitimate trading activity and credible returns, that Defendants were benefiting from fraudulent transactions in the Equity Trading

account, that Madoff's IA Business was predicate on fraud, and/or that the Transfers were fraudulent.

91.     Equity Trading was the initial transferee of the avoidable transfers set forth above.

92.     The Transfers are avoidable and recoverable under sections 544, 547, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and New York Debtor and Creditor Law ("DCL") sections 273 – 279 (McKinney 2001).

93.     During the two years prior to the Filing Date, BLMIS made transfers to Equity Trading totaling the amount of $16,204,541 (the "Two-Year Transfers").  See Exhibit B, column 10.

94.     The Two-Year Transfers are avoidable and recoverable under sections 548, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

95.     During the six years prior to the Filing Date, BLMIS made transfers to Equity Trading totaling the amount of $16,465,669 (the "Six-Year Transfers").  See Exhibit B, column 11.

96.     The Six-Year Transfers are avoidable and recoverable under sections 544, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL sections 273 – 279.

97.     During the 90 days prior to the Filing Date, BLMIS made payments or other transfers totaling the amount of $15,201,525 to Equity Trading (the "Preference Period Transfers").  See Exhibit B, column 9.

98.     The Preference Period Transfers are avoidable and recoverable under sections 547, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

99.     BNP received a subsequent transfer of the avoidable transfers during the Preference Period (the "Subsequent Transfer"), which is recoverable pursuant to Section 550(a) of the Bankruptcy Code.

100.     On or about November 10, 2008, at the request of ETF, BLMIS wired $15,000,000 to Equity Trading's bank account.  On November 14, 2008, Equity Trading transferred this $15 million to BNP (as defined above, the "Subsequent Transfer").

101.     The foregoing Subsequent Transfer, or the value thereof, is recoverable from BNP pursuant to section 550(a) of the Bankruptcy Code.

102.     The Transfers and Subsequent Transfer were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA.

103.     Equity Trading knew or should have known of fraudulent activity in connection with its BLMIS account and/or that the Transfers might have been made for a fraudulent purpose.

104.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

<u>COUNT ONE</u>
**<u>PREFERENTIAL TRANSFERS - 11 U.S.C. §§ 547(b), 550(a), AND 551</u>**
(As to Equity Trading)

105.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

106.    At the time of each of the Preference Period Transfers, Equity Trading was a "creditor" of BLMIS both within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

107.    Each of the Preference Period Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

108.    Each of the Preference Period Transfers was to or for the benefit of Equity Trading.

109.    Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

110.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

111.    Each of the Preference Period Transfers was made during the 90 day preference period under Section 547(b)(4) of the Bankruptcy Code.

112.    Each of the Preference Period Transfers enabled Equity Trading to receive more than Equity Trading would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) Equity Trading received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

113.    Each of the Preference Period Transfers constituted a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable

from Equity Trading as initial transferee for the entities for whose benefit such transfers were made pursuant to section 550(a) of the Bankruptcy Code.

114.    As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (i) avoiding and preserving the Preference Period Transfers; (ii) directing that the Preference Period Transfers be set aside; and (iii) recovering the Preference Period Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS.

**COUNT TWO**
**FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551**
(As to Equity Trading)

115.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

116.    Each of the Two-Year Transfers was made on or within two years before the Filing Date.

117.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

118.    Each of the Two-Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two-Year Transfers to or for the benefit of Equity Trading in furtherance of a fraudulent investment scheme.

119.    Each of the Two-Year Transfers constituted a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Equity Trading pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

120.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS.

### COUNT THREE
### FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a) AND 551
(As to Equity Trading)

121.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

122.    Each of the Two-Year Transfers was made on or within two years before the Filing Date.

123.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

124.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two-Year Transfers.

125.    At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became insolvent, as a result of the Two-Year Transfers.

126.    At the time of each of the Two-Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small amount of capital.

127.    At the time of each of the Two-Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

128.    Each of the Two-Year Transfers constituted fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Equity Trading pursuant to section 550(a) and SIPA § 78fff-(2)(c)(3).

129.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS.

**COUNT FOUR**
**FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**
(As to Equity Trading)

130.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

131.    At all times relevant to the Six-Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured, unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

132.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

133.     Each of the Six-Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six-Year Transfers to or for the benefit of Equity Trading in furtherance of a fraudulent investment scheme.

134.     Each of the Six-Year Transfers was received by Equity Trading with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Six-Year Transfers, and/or future creditors of BLMIS.

135.     As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; (iii) recovering the Six-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Equity Trading.

## COUNT FIVE
## FRAUDULENT TRANSFER --NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551
(As to Equity Trading)

136.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

137.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured, unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

138.     Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

139.     BLMIS did not receive fair consideration for the Six-Year Transfers.

140.    BLMIS was insolvent at the time it made each of the Six-Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six-Year Transfers.

141.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS.

## COUNT SIX
## FRAUDULENT TRANSFER—NEW YORK DEBTOR AND CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551
(As to Equity Trading)

142.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

143.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured, unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

144.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

145.    BLMIS did not receive fair consideration for the Six-Year Transfers.

146.    At the time BLMIS made each of the Six-Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six-Year Transfers was an unreasonably small amount of capital.

147.    As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee

is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Six-Year

Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year

Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFER–NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551
(As to Equity Trading)

148.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

149.     At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured, unsecured claims against BLMIS that are allowable under section

502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the

Bankruptcy Code.

150.     Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

151.     BLMIS did not receive fair consideration for the Six-Year Transfers.

152.     At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay them as the

debts matured.

153.     As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee

is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Six-Year

Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year

Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS.

## COUNT EIGHT
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE)
## 11 U.S.C. §§ 547(b), 550(a), AND 551
(As to BNP)

154.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

155.     Each of the Preference Period Transfers is avoidable under section 78fff-2(c)(3) of SIPA and section 547(b) of the Bankruptcy Code.  Furthermore, each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

156.     BNP is the immediate or mediate transferee of some portion of the Preference Period Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Preference Period Subsequent Transfer").

157.     The Preference Period Subsequent Transfer was made directly or indirectly to, or for the benefit of, BNP.

158.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Preference Period Subsequent Transfer, or the value thereof, from BNP for the benefit of the estate of BLMIS.

## COUNT NINE
## RECOVERY OF SUBSEQUENT TRANSFERS - NEW YORK DEBTOR AND
## CREDITOR LAW §§ 273 - 279 AND 11 U.S.C. §§ 544, 548, 550(a) AND 551
(As to BNP)

159.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

160.    Each of the Transfers is avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273-279 and SIPA § 78fff-2(c)(3).

161.    BNP received a Subsequent Transfer, which is recoverable pursuant to section 550(a) of the Bankruptcy Code.

162.    The Subsequent Transfer was made directly or indirectly to, or for the benefit of, BNP.

163.    BNP is the immediate or mediate transferee of the Subsequent Transfer.

164.    As a result of the foregoing, pursuant to DCL sections 278 and/or 279, section 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP recovering the Subsequent Transfer, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TEN
## MONEY HAD AND RECEIVED
(As to All Defendants)

165.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

166.    Defendants are currently in possession of, or have control over, monies that originated from BLMIS.  These monies are Customer Property and belong to the customer fund under the Trustee's control.  Defendants have no lawful or equitable right to these monies, having obtained the monies through fraud, deceit, and/or mistake.

167.    In equity and good conscience, Defendants may not retain possession or control of these monies, which rightfully belong to the customer fund under the Trustee's control. Defendants are obligated to return all such monies to the Trustee.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

        i.      On the First Count, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (i) avoiding and preserving the Preference Period Transfers; (ii) directing that the Preference Period Transfers be set aside; and (iii) recovering the Preference Period Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS;

        ii.      On the Second Count, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS;

        iii.      On the Third Count, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Two-Year Transfers; (ii) directing that the Two-Year Transfers be set aside; and (iii) recovering the Two-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS;

        iv.      On the Fourth Count, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544, 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; (iii) recovering the Six-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS; and (iv) recovering attorneys' fees from Equity Trading;

v.       On the Fifth Count, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS;

vi.      On the Sixth Count, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS;

vii.     On the Seventh Count, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Equity Trading: (i) avoiding and preserving the Six-Year Transfers; (ii) directing that the Six-Year Transfers be set aside; and (iii) recovering the Six-Year Transfers, or the value thereof, from Equity Trading for the benefit of the estate of BLMIS.

viii.    On the Eighth Count, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Preference Period Subsequent Transfer, or the value thereof, from BNP for the benefit of the estate of BLMIS;

ix.      On the Ninth Count, pursuant to DCL sections 278 and/or 279, section 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP recovering the Subsequent Transfer, or the value thereof, for the benefit of the estate of BLMIS;

x.    On all Counts, pursuant to federal common law and N.Y. CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xi.    On all Counts, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

xii.    On all Counts, assignment of Equity Trading's rights to seek refunds from the government for federal, state, and local taxes paid on fictitious profits during the course of the scheme;

xiii.    On all Counts, awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xiv.    On all Claims for Relief, granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: November 30, 2010
     New York, NY

/s/ David J. Sheehan
David J. Sheehan
Keith R. Murphy
Marc Skapof
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

-and-

Frederick W. Chockley, III
John J. Burke
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW, Suite 1100
Washington, D.C. 20036
Telephone: (202) 861-1680
Facsimile: (202) 861-1783

*Attorneys for Irving H. Picard, Esq. Trustee for the SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*